**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

_____
:
KATHRYN GARCIA, on behalf of herself   :
and all others similarly situated,   :
:
:                                      Civil Action No. 08-5756 (JAG)
Plaintiff,   :
:                                      **OPINION**
v.   :
:
THE PRUDENTIAL LIFE INSURANCE   :
COMPANY OF AMERICA,   :
:
Defendant.   :
_____:

**GREENAWAY, JR., U.S.D.J.**

Kathryn Garcia ("Plaintiff") brings this putative class action against The Prudential

Insurance Company of America ("Defendant"), asserting causes of action for breach of contract,

breach of fiduciary duty, and unjust enrichment.  Plaintiff's claims arise from allegations that

Defendant engaged in a practice of delaying the payment of life insurance benefits due to

beneficiaries so that it could (a) invest the benefits, in a manner not disclosed to the beneficiaries,

and (b) make a profit from the earnings resulting from those investments during the period of

delay.

This matter comes before this Court on the motion of Defendant to dismiss the putative

class action Complaint filed by Plaintiff for failure to state a claim upon which relief can be

granted.  (Docket No. 14.)  For the reasons set forth below, Defendant's motion to dismiss the

Complaint is granted, without prejudice.

## BACKGROUND

The factual allegations of the Complaint are taken as true for the purposes of the instant motion practice.  To the extent, however, that the there are documents integral to or explicitly relied upon in the Complaint, those documents may be considered without converting this Motion into a motion for summary judgment.  In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997).

### I.    The Parties

Plaintiff is a citizen of Nevada.  (Compl. ¶ 4.)  She is the primary beneficiary of three life insurance policies purchased by her husband, Nick Garcia ("Mr. Garcia"), who is now deceased.  (Id. ¶ 2.)  The policies were issued by Defendant.  (Id.)

Defendant, a publicly held company, has its principal place of business in Newark, New Jersey.  (Id. ¶ 3.)  Defendant, its subsidiaries, and related companies offer insurance products throughout the United States.  (Id.)  Life insurance policies are among the products it offers.  (Id.)

### II.   The Life Insurance Policies

Mr. Garcia purchased three life insurance policies (collectively, "the Policies") – policy numbers 32348855 ("1956 Policy"), 33988790 ("1972 Policy"), and 79097732 ("1983 Policy") – from Defendant.  (Id. ¶ 12; Certification of John R. Middleton, Jr. In Support of Defendant's Motion to Dismiss Plaintiff's Complaint ("Middleton") Exs. A:13, B:16, C:15.)

Mr. Garcia entered into the 1956 Policy in California while he was a domiciliary of California.  (Id. A:24.)  He entered into the 1972 Policy in Nevada while he was a domiciliary of California.  (Id. B:23-24.)  He entered into the 1983 Policy in Nevada while he was a domiciliary

2

of Nevada.  (Id. C:18.)

The Policies name Plaintiff as the primary beneficiary.[1]  (Compl. ¶ 12; Middleton Exs. A:13, B:16, C:15.)  Each policy provided that Mr. Garcia could elect, from among several options, the manner in which the proceeds would be paid (the "Mode of Settlement").[2] (Middleton Exs. A:13, B:16, C:15.)  The Policies' plan descriptions described four possible Modes of Settlement:  (1) Installments for a Fixed Period, (2) Life Income, (3) Interest Payments, (4) Installments of a Fixed Amount.  (Id. Exs. A:6-7, B:14, C:11.)  The 1983 Policy's plan description also described a fifth option, Non-Participating Life Income.  (Id. Ex. C:11.)  Each policy stated that, should Mr. Garcia not elect a Mode of Settlement, the beneficiary may elect an option when the proceeds become available to him or her.  (Id. Exs. A:5, B:14, C:11.)

Although not listed in the literature, a "one sum" option is listed above the other four options in the checklist of Mode of Settlement options in the 1956 and 1972 Policies.  (Id. Exs. A:13, B:16.)    In the 1983 Policy, a checklist is not provided; rather, the Mode of Settlement is designated by a sentence typed into a blank field.  (Id. Ex. C:15.)  Though expressly provided as a checklist option in the 1956 and 1972 Policies, the one sum option is not described as an option in the literature accompanying any of the Policies.  (Id. Exs. A:6-7, B:14, C:11.)

For each policy, Mr. Garcia elected that proceeds were to be distributed to the

---

[1]  Each policy lists Plaintiff as the class one beneficiary, and Plaintiff's children with Mr. Garcia as class two beneficiaries.  (Middleton Exs. A:13, B:16, C:15.)  A class one beneficiary becomes entitled to benefits at the death of the insured.  (Id.)  A class two beneficiary becomes entitled to benefits at the death of the last to die of the insured and the class one beneficiary.  (Id.)

[2]  The 1956 and 1972 Policies define "settlement" as "an arrangement whereby an amount is either held at interest or paid in installments, or both, as distinguished from an immediate payment of such amount."  (Middleton Exs. A:14, B:17.)

3

beneficiaries in one sum.  (Id., Exs. A:13, B:16, C:15.)  In the 1956 and 1972 Policies, he did so

by checking the box adjacent to "One sum" under the Mode of Settlement.  (Id. Exs. A:13, B:16.)

In the 1983 Policy, the election was indicated by a sentence stating:  "The proceeds which arise

from the Insured's death will be settled in one sum with the beneficary(ies) shown below."  (Id.

C:15.)   The Policies provide that benefits will be paid "immediately" or "promptly" upon receipt

of proof of the insured's death.[3]

> Article 4 of the General Provisions of the 1956 and 1972 Policies provides:
>
> Unless otherwise provided in this Beneficiary Provision, and subject to the provisions of Article 6, . . . *a person entitled to receive payment of any residue becoming payable in one sum may elect to place under any option all or a part of such residue as of the date such residue becomes payable.*

(Id. A:15 (emphasis added), B:18 (emphasis added).)

> Similarly, the Choosing an Option section of the Settlement Options page in the 1983

Policy provides:  "*A payee may choose an option for all or part of any proceeds or residue which

becomes payable to him or her in one sum.*"  (Id. C:11 (emphasis added).)

---

[3]  The 1956 Policy provides:  "Unless otherwise provided by the Policy, the face amount of insurance under this Policy is payable to the Beneficiary immediately upon receipt of due proof of the death of the Insured and upon legal surrender of this Policy, both at the Home Office of the Company."  (Middleton Ex. A:2.)

The 1972 Policy provides:  "The Prudential Insurance Company of America will, subject to the provisions of this policy, pay the face amount to the Beneficiary immediately upon receipt at the Home Office of due proof of the Insured's death."  (Id. Ex. B:1.)

The 1983 Policy provides:  "We will pay the beneficiary the proceeds of this contract promptly if we receive due proof that the Insured died."  (Id. Ex. C:1.)

III.   **Events After The Insured's Death**

Mr. Garcia died on November 23, 2005, and Plaintiff filed a timely claim for the death benefits available under the Policies.  (Compl. ¶ 13.)  Defendant sent Plaintiff a Life Insurance Death Benefits Claim Form ("Claim Form") and Settlement Options Brochure.  (Middleton Ex. D; Compl. Ex.1.)  The Settlement Options Brochure lists six ways in which Plaintiff can access her death benefits:  Alliance Account, Life Income, Life Income with a Certain Period, Fixed Period, Fixed Amount, and Interest Payment.  (Compl. Ex. 1:1)  After describing the six available settlement options in some detail (id. Ex. 1:2-4), the Settlement Options Brochure states, "A number of other settlement options are also available.  If you are interested in an option not listed here, please contact us . . . ."  (Id. Ex. 1:4.)

The Claim Form states, "Prudential's preferred method of paying death benefits is through the Alliance Account settlement option."  (Middleton Ex. D:1.)  Defendant's materials describe the Alliance Account as, "A convenient, no-cost option that allows you to access funds immediately to cover current expenses, or in the future after you have had time to consider all of your financial options."  (Compl. Ex. 1:2.)  The Alliance Account offers, *inter alia*, "competitive interest rates"; access to all funds immediately or over time by writing checks; no monthly service charges, per-check charges, or check reorder charges;[4] and the ability to select a different payment option at any time.  (Id.)

Section three of the Claim Form, in which the beneficiary can designate his or her preferred settlement option, states, "Unless you elect an alternative settlement option or select

---

[4]  There are per-check fees for checks made out for less than $250 and fees for special services.  (Compl. Ex. 1:2; Middleton Ex. D:7.)  Those fees are not at issue in this case.

another payment option, eligible death claim benefits will be paid by way of the Alliance

Account settlement option." (Middleton Ex. D:2.)  Plaintiff left blank the fields that allowed her

to designate another settlement or payment option.. (Middleton Ex. D:2.)  Plaintiff executed the

Claim Form on January 28, 2006.  (Id. D:3).  The following statement appeared above her

signature:  "I have read and agree to sections 1 through 6."  (Id.)

Defendant determined that $16,830.28 was due to Plaintiff under the terms of the

Policies.  (Compl. ¶ 14.)  Defendant opened an Alliance Account in Plaintiff's name and retained

the death benefit in the account.  (Id.)

On November 21, 2008, Plaintiff filed a putative class action in this Court.  The

Complaint alleges that Defendant was obligated, under the express terms of the Policies, to

provide Plaintiff the death benefits she was owed in a single sum payment.  (Compl. ¶ 14.)  She

defined the class as "[a]ll beneficiaries of Prudential Policies sold in the United States whose

death benefits were placed in a Prudential Alliance Account" except for directors, officers, agents

and/or employees of Prudential, Plaintiff's counsel, and the judge to whom the case is assigned.[5]

(Compl. ¶ 17.)

The Complaint states four claims for relief:  (1) breach of the insurance contracts; (2)

breach of the Alliance Account contracts; (3) breach of fiduciary duty; and (4) unjust enrichment.

(Compl. ¶¶ 27-53.)  The gravamen of Plaintiff's Complaint is that Defendant engaged in a

practice of delaying the payment of life insurance benefits due to beneficiaries so that it could (a)

---

[5]  In a footnote to the class definition, Plaintiff states, "Prudential's Alliance Account may
have previously been referred to by Prudential under different names.  This Complaint is directed
at the conduct of Prudential in retaining Benefits and the manner in which it invests Benefits
belonging to plaintiff and Class Members regardless of the name under which the scheme
operated."  (Compl. ¶ 17 n.1.)

invest the benefits, in a manner not disclosed to the beneficiaries, and (b) make a profit from the earnings resulting from those investments during the period of delay.  (Id. ¶ 1.)  Plaintiff's Complaint refers to this practice as the "Checkbook Instead of a Check" program.  (Id.)

On March 11, 2009, Defendant filed a motion to dismiss the complaint for failure to state a claim on which relief can be granted ("Motion").  (Docket No. 14.)  That Motion is the subject of this Opinion.

## JURISDICTION AND VENUE

The Complaint avers that this Court has subject matter jurisdiction over these claims pursuant to 28 U.S.C. § 1332(d).  Plaintiff alleges that there are more than 100 class members.  (Compl. ¶ 4.)  Plaintiff is a citizen of Nevada.  (Id.)  Defendant is principally based in New Jersey.  (Id.)  The matter in controversy is, on information and belief, in excess of $5 million, exclusive of interests and costs.  (Id.)  Plaintiff avers that personal jurisdiction is proper because Defendant is principally based in New Jersey.  (Id. ¶ 3.)  Plaintiff implies that venue is proper, pursuant to 28 U.S.C. § 1391(a), for the same reason.

Defendant has not contested the factual premises of Plaintiff's jurisdictional allegations, which appear on their face to meet the requirements of the statutes.

## LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) provides that a party may move to dismiss a claim for relief in any pleading for failure to state a claim upon which relief can be granted.

"Federal Rule of Civil Procedure 8(a)(2) requires only a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests."  Bell Atl. Corp. v. Twombly, 550

U.S. 544, 555 (2007) (internal quotations omitted).  "When there are well-pleaded allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement of relief."  Ashcroft v. Iqbal, 129 S. Ct.1937, 1950 (2009); see also Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1384-85 (3d Cir. 1994) (a court must accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the non-moving party).  The question is whether the claimant can prove any set of facts consistent with his or her allegations that will entitle him or her to relief, not whether that person will ultimately prevail.  Semerenko v. Cendant Corp., 223 F.3d 165, 173 (3d Cir. 2000).  A motion to dismiss for failure to state a claim should be granted only if the party asserting the claim is unable to articulate "enough facts to state a claim to relief that is plausible on its face."  Twombly, 550 U.S. at 570.

However, "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  Twombly, 550 U.S. at 555. (internal citations omitted).  "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."  Iqbal, 129 S. Ct. at 1950.  "[A] court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth."  Id.  A court will not accept as true bald assertions, unsupported inferences, or sweeping legal conclusions cast in the form of factual allegations.  Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 n.8 (3d Cir. 1997).

In reviewing a motion to dismiss for failure to state a claim upon which relief can be

granted, a court may consider the allegations of the complaint, as well as documents attached to or specifically referenced in the complaint, and matters of public record.  Pittsburgh v. W. Penn Power Co., 147 F.3d 256, 259 (3d Cir. 1998).  "Plaintiffs cannot prevent a court from looking at the texts of the documents on which [their] claim is based by failing to attach or explicitly cite them."  In re Burlington Coat Factory Sec. Litig., 114 F.3d at 1426.  "[A] 'document *integral to or explicitly relied* upon in the complaint' may be considered 'without converting the motion [to dismiss] into one for summary judgment.'"  Id. (emphasis in original) (quoting Shaw v Digital Equip. Corp., 82 F.3d 1194, 1220 (1st Cir. 1996)).  Any further expansion beyond the pleading, however, may require conversion of the motion into one for summary judgment.  FED. R. CIV. P. 12(d).

"The defendant bears the burden of showing that no claim has been presented."  Hedges v. U.S., 404 F.3d 744, 750 (3d Cir. 2005).

## ANALYSIS

Defendant moves to dismiss each of the Complaint's four counts for failure to state a claim upon which relief can be granted.  For the reasons addressed below, Defendant's Motion is granted.

## I.     Choice Of Law

Each of the Complaint's four counts is a state-law based claim.  Therefore, this Court must first determine the applicable law to apply to the claims.

A federal court with diversity jurisdiction must apply the choice of law principles of the forum state.  Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496-97 (1941).  Under New Jersey law, the governing law in a contract case is that of the jurisdiction with the most

significant relationship and closest contacts with the transaction and the parties.  Keil v. Nat'l

Westminster Bank, 710 A.2d 563, 569 (N.J. Super. Ct. App. Div. 1998); State Farm Mut. Auto.

Ins. Co. v. Estate of Simmons,  417 A.2d 488, 491-92 (N.J. 1980).   To determine which state has

more significant contacts with the parties and the contract, New Jersey courts look to the

following non-exclusive contacts listed in § 188 of the Restatement (Second) of Conflict of

Laws:

> (a) the place of contracting,
> (b) the place of negotiation of the contract,
> (c) the place of performance,
> (d) the location of the subject matter of the contract, and
> (e) the domicil, residence, nationality, place of incorporation and place of business
> of the parties.

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188(2) (1969); see, e.g., Keil, 710 A.2d at

569-70.

In addition, courts consider the factors relevant to the applicable rule of law in § 6 of the

Restatement:

> (a) the needs of the interstate and international systems,
> (b) the relevant policies of the forum,
> (c) the relevant policies of other interested states and the relative interests of those
> states in the determination of the particular issue,
> (d) the protection of justified expectations,
> (e) the basic policies underlying the particular field of law,
> (f) certainty, predictability and uniformity of result, and
> (g) ease in the determination and application of the law to be applied.

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 6 (1969); see Gen. Ceramics Inc. v. Firemen's

Fund Ins. Cos., 66 F.3d 647, 653 (3d Cir. 1995).  There is a presumption that the law of the place

of contracting should apply to the interpretation of the contract.

> Because the law of the place of contract "generally comport[s] with the
> reasonable expectations of the parties" concerning the applicable and

> controlling legal principles, "that forum's law should be applied unless
> the dominant and significant relationship of another state to the parties or
> the underlying issue dictates that this basic rule [should] yield."

Keil, 710 A.2d at 569 (quoting Gilbert Spruance Co. v. Pennsylvania Mfrs. Ass'n Ins. Co., 629

A.2d 885 (N.J. 1993)).

For the following reasons, this Court finds that Nevada provides the proper law to address

Plaintiff's two breach of contract claims.

Where a claim alleges breach of an insurance policy, such as here, "the law of the place of

the contract ordinarily governs the choice of law." State Farm Mut. Auto Ins. Co. v. Estate of

Simmons, 417 A.2d 488, 492 (N.J. 1980). Thus, this Court commences with the provisional

recognition that the law of California, where the 1956 was originally obtained, should govern the

determination of the rights and liabilities of the parties under that contract, and that the law of

Nevada, where the 1972 and 1983 Policies and the Alliance Account were obtained or entered

into, should govern the determination of the rights and liabilities of the parties under those

contracts. Id. at 492.

Selection of those states' laws "presumptively comports with the reasonable expectations

of the contracting parties as to the primary location of the insurance risk and satisfies the needs

for certainty, predictability, and uniformity." Id. This choice of law "should [] be dispositive

unless an evaluation of significant state relationships, an evaluation which includes state policies

and governmental interests, would require a different result." Id. at 493. The analysis of state

policies and governmental interests dictates that Nevada law should apply to all three Policies

and the Alliance Account.

In particular, the third and fourth factors of Restatement § 6 militate in favor of Nevada

law.  Nevada public policy "protect[s] those with interests under insurance policies, insuring that policyholders, claimants and insurers are treated fairly and equitably, and preventing misleading, unfair and monopolistic practices in insurance operations."  Daniels v. Nat'l Home Life Assurance Co., 747 P.2d 897, 899 (Nev. 1987).  Plaintiff, domiciled in Nevada, is a claimant protected by Nevada public policy.  In addition, her late husband, who took out the Policies on Plaintiff's behalf, was a domiciliary of Nevada prior to his death.  Even though he purchased the 1956 Policy in California, Nevada's interest in the claims under that policy is stronger than that of California.  California no longer has any significant interest in enforcing the terms of that policy.  No party to, or beneficiary under, the policy resides in California.  When Mr. Garcia moved to Nevada, it (Nevada) assumed the primary interest in protecting his rights, and those of his beneficiaries, under the 1956 Policy

Regarding the 1972 and 1983 Policies, Nevada plainly has the strongest ties.  Both were entered into in Nevada.  Further, the Alliance Account was entered into in Nevada by Plaintiff, while she was domiciled in Nevada.  The application of Nevada law to all three policies accords with the justified expectations of the parties.  Therefore, Nevada law applies to both of Plaintiff's breach of contract claims.

Nevada law also governs Plaintiff's claim for breach of fiduciary duty.  Plaintiff, to whom the alleged duty is owed, is a domiciliary of Nevada.  The parties agreed on the record, during oral argument, that Nevada law applies to this claim.  (Transcript of Oral Argument at 31:2-9; see also id. at 23:14-24:2 (stating Plaintiff's agreement that Nevada law applies to two of the policies and California law to one, and further stating that the result of this Court's analysis would be the same if Nevada law is applied to all three policies).)

The proper choice of law for Plaintiff's claim for unjust enrichment is less clear.  There is a case to be made for the application of either Nevada or New Jersey law under the "most significant relationship" and "governmental interest" tests.  Nevada has a governmental interest in protecting its residents from being victims of unjust enrichment.  New Jersey has a significant relationship because the alleged unjust enrichment was realized by Defendant, incorporated and headquartered in that state.  The factual record is not developed enough to allow this Court to apply the various factors involved in deciding which state has the greatest interest in resolving the issue.  See Harper v. LG Elec. USA, Inc., 595 F. Supp. 2d 486, 489 (D.N.J. 2009) (refraining from making choice of law determination in 12(b)(6) motion to dismiss until development of the necessary factual record).  The analysis of Plaintiff's unjust enrichment claim, therefore, must be conducted under both Nevada and New Jersey law.

## II.     Breach Of Contract With Respect To The Policies

Plaintiff's first cause of action is for breach of contract with respect to Mr. Garcia's life insurance policies.  Plaintiff alleges that, pursuant to the Policies, Defendant was required to pay the death benefit to her in a single sum.  It follows, therefore, that Defendant's failure to pay the benefits in a single sum, along with the presentation of a Claim Form which allowed Plaintiff to alter the manner in which she was to receive the death benefit from the "one sum" selection made by Mr. Garcia, constituted a breach of the Policies.

This Court finds that the language of the Policies themselves, along with the Claim Form executed by Plaintiff, effectively overruled the one sum option, as specified in the Policies.  As such, Plaintiff is incapable of proving any set of facts consistent with her allegations that will entitle her to relief.  Semerenko, 223 F.3d at 173.  Defendant's motion to dismiss count one of

13

the Complaint is granted.[6]

Under Nevada law, insurance policies are contracts, which must be enforced according to their terms.  Continental Cas. Co. v. Summerfield, 482 P.2d 308, 310 (Nev. 1971).   "A plaintiff in a breach of contract action must show (1) the existence of a valid contract, (2) a breach by the defendant, and (3) damage as a result of the breach."  Brown v. Kinross Gold U.S.A., Inc., 531 F. Supp. 2d 1234, 1240 (D. Nev. 2008) (quotation omitted) (citing Richardson v. Jones, 1 Nev. 405, 1865 WL 1066, at *2 (1865)).  "[A]bsent some countervailing reason, contracts will be construed from the written language and enforced as written."  Ellison v. California State Auto. Ass'n, 797 P.2d 975, 977 (Nev. 1990).  "The court has no authority to alter the terms of an unambiguous contract."  Canfora v. Coast Hotels & Casinos, Inc., 121 P.3d 599, 603 (Nev. 2005).  A court may "construe an ambiguous contract provision . . . against the drafter of the ambiguous provision."  American Fire & Safety, Inc. v. City of N. Las Vegas, 849 P.2d 352, 362 (Nev. 1993).  A contract term is ambiguous if it is "reasonably susceptible to more than one interpretation."  Shelton v. Shelton, 78 P.3d 507, 510 (Nev. 2003).

There can be no breach of contract where the Policies, by their express terms, allow Plaintiff to elect to receive her benefits in a manner different than specified by Mr. Garcia, so long as Defendant complies with Plaintiff's election.  The 1956 and 1972 Policies provide that "a person entitled to receive payment of any residue becoming payable in one sum may elect to place under any option all or part of such residue as of the date such residue becomes payable." (Middleton Exs. A:15, B:18.)  The 1983 Policy provides that "[a] payee may choose an option

_____

[6]  This Court does not address Defendant's other arguments in support of its Motion regarding this claim.

for all or part of any proceeds or residue which becomes payable to him or her in one sum."  (Id. Ex. C:11.)

On the Claim Form that she submitted after her husband's death, Plaintiff chose to receive her residue by way of an Alliance Account.  The Life Insurance Payment Options section of the Claim Form stated that, "Unless you elect an alternative settlement option or select another payment option, eligible death claims benefits will be paid by way of the Alliance Account settlement option."  (Id. Ex. D:2.)  Plaintiff left blank the space provided to indicate an alternative settlement option or select another payment option.[7]  (Id.)

When Plaintiff executed the Claim Form without explicitly designating that she wished to receive the benefits she was due under the Policies, she effectively changed the method by which she would receive those benefits from one sum to an Alliance Account.[8]

Because "[a] court has no authority to alter the terms of an unambiguous contract,"

---

[7]  The cases on which Plaintiff relies are distinguishable because, in those cases, the beneficiaries did not elect to change the manner in which they would receive their death benefits.  See Mogel, 547 F.3d at 25 (the factual background indicates that plaintiffs' "lump sum" election was not modified by claim form); Rabin v. MONY Life Ins. Co., 2007 WL 737474, at *3 (S.D.N.Y. Mar. 8, 2007) ("Plaintiff's contract claims turn principally on his assertions that the 'cash value' payment provisions of his policies did not permit *MONY to choose its own financial vehicle as a payment conduit . . .*") (emphasis added); see also Clark v. Metropolitan Life Ins. Co., 2009 WL 536830, at * 2-3 (D. Nev. Mar. 3, 2009) (no indication that plaintiff agreed to have funds placed in an interest-bearing account).

[8]  Plaintiff notes, correctly, that the Claim Form is a contract of adhesion.  See United Nat'l Ins. Co. v. Frontier Ins. Co., Inc., 99 P.3d 1153, 1156 (Nev. 2004) ("We have previously held that '[a]n insurance policy is a contract of adhesion.'" (quoting Farmers Ins. Group v. Stonik, 867 P.2d 389, 391 (Nev. 1994)).  Plaintiff apparently raises this fact as a shorthand argument that, even if the Claim Form is an otherwise valid contract, it, or the settlement option election within it, is unenforceable.  In order to avoid enforcement of the terms of a contract, however, it is not enough that the contract is adhesive.  See Mallin v. Farmers Ins. Exch., 839 P.2d 105, 118 (Nev. 1992) ("adhesion contracts are not unenforceable per se").  Plaintiff raises no additional argument why the Claim Form or any of its terms are unenforceable.

15

Canfora, 121 P.3d at 603, this Court finds that Plaintiff is not capable of proving any set of facts consistent with her allegations that will entitle her to relief. Semerenko, 223 F.3d at 173. Defendant's Motion is granted with respect to the Plaintiff's claim for breach of the Policies.

## III.    Breach Of Contract With Respect To The Assurance Account

Plaintiff's second cause of action states a claim for breach of the Alliance Account contract. Specifically, Plaintiff alleges that Defendant (1) failed to establish a personal interest-bearing account in Plaintiff's name, (2) charged Plaintiff substantial sums for operating the Alliance Account, (3) retained full control of Plaintiff's funds in the Alliance Account, and (4) failed to define or identify what it meant when it stated that the account provided "competitive interest rates," and failed to pay Plaintiff earnings generated by her funds. The gravamen of these allegations is that, pursuant to Claim Form and supporting descriptions of the Alliance Account, Defendant was required to retain Plaintiff's benefits in a segregated account, to inform Plaintiff of the manner in which her benefits were invested, and to pay Plaintiff all profits resulting from that investment.

In its Motion, Defendant argues that each of Plaintiff's allegations is refuted by the language in the portion of the Alliance Account contract attached to Plaintiff's Complaint as an exhibit. As a result, Defendant argues, Plaintiff has failed to state a claim for breach of the Alliance Account upon which relief can be granted. This Court agrees.

First, Plaintiff claims that Defendant breached the Alliance Account policies by failing to establish a personal interest-bearing account on Plaintiff's behalf. Unless the parties' agreement specifically provides otherwise, there is no duty to segregate Plaintiff's funds from an institution's general assets. Peoples Westchester Savings Bank v. F.D.I.C., 961 F.2d 327 (2d Cir.

16

1992).[9]

In the alternative, Plaintiff argues that Defendant's promises to establish a "personal interest-bearing account" in which Plaintiff can "leave the money" leads to the impression that a segregated account has been created.  (Opp. 22.)  This is an unreasonable reading of Defendant's promises regarding the Alliance Account.  Defendant did, in fact, create a "personal interest-bearing account" in Plaintiff's name.  (Middleton Ex. D:6.)  The benefits remained accessible to Plaintiff at all times, and she could choose to withdraw any portion of funds greater than $250 – up to and including the entirety of her benefits – at any time, at no charge.[10]  (Middleton Ex. D:1.)

Second, Plaintiff claims that the Alliance Account is not a "no-cost option" for accessing benefits.  Plaintiff's claim is based on her assertion that Defendant utilized some of the money it earned from investing the benefits to which Plaintiff is entitled to pay for Defendant's costs and provide protection against the financial risks that Defendant absorbs in reinvesting the funds.  More plainly, Plaintiff claims that Defendant's failure to pay over all proceeds that it may have

---

[9] Plaintiff argues that <u>Peoples Westchester Savings Bank</u> is inapposite because, while the institution in that case was an FDIC-insured bank, Prudential is neither a bank nor FDIC insured. (Opp. 24.)  <u>Peoples Westchester Savings Bank</u> did not rely, however, on those facts.  Further, Plaintiff provides no alternate authority providing that a corporation that is neither a bank nor FDIC insured must segregate funds it holds for customers in personal accounts.

[10] Nevada Revised Statute § 687B.300 provides an additional ground for denying Plaintiff's claim.  Section 687B.300(1) states, "Any life insurer shall have power to hold payment of proceeds, as has been agreed to in writing by the insurer and the insured or beneficiary.  The insurer shall not be required to segregate funds so held but may hold them as part of its general corporate assets."  As discussed above, by leaving the Life Insurance Payment Options section blank on her Claim Form, Plaintiff agreed that Defendant would establish an Alliance Account as the means of paying Plaintiff's death benefits.  The Claim Form represents an agreement, in writing, between the insurer and the beneficiary under the statute.

generated with Plaintiff's funds constitutes a breach of Defendant's promise to provide a "no-cost" account.

"Cost" means "the amount paid or charged for something; price or expenditure." BLACK'S LAW DICTIONARY (9th ed. 2009). Defendant's statement that the Alliance Account is a "no-cost option," therefore, constitutes a promise by Defendant not to impose charges or fees on Plaintiff for the account's operation.[11] In its Motion, Defendant states: "By analogy, when a consumer opens a 'no-cost' account at a bank, he or she does not think that the bank is going to pay over all of the proceeds that the bank may be able to generate with the deposited funds." (Mot. 20-21.) This Court finds Defendant's analogy apt.

It is not reasonable to define "no cost" as providing Plaintiff with all of the potential gains generated by Defendant's investment of her benefits. See Shelton v. Shelton, 78 P.3d 507, 510 (Nev. 2003) (reasonable susceptibility to more than one meaning is required to find a contract term ambiguous). This is especially true because Plaintiff bears no risk if Defendant's investments lose money.[12] To summarize, "no cost" plainly means no service fees.

Third, Plaintiff claims that Defendant breached the Alliance Account contract by retaining full control over Plaintiff's funds, in contrast to Defendant's promise that "the beneficiary has control over the funds in his or her Alliance Account." Defendant's motion to dismiss this claim is granted.

---

[11] The Alliance Account does charge fees for "special services." (Middleton Ex. D:7.) Plaintiff's claim, however, is not based on the imposition of those fees. (Compl. ¶ 38(B).)

[12] At oral argument, counsel for Plaintiff argued that she bears risk because the Alliance Account funds are not FDIC insured. (Transcript of Oral Argument at 22:3-11.) While true, Alliance Account funds are protected under Nevada law by the Nevada Life and Health Guaranty Association. Nev. Rev. Stat. §§ 686C.010-390.

In reviewing all of the descriptions of the Alliance Account, this Court does not find any mention that Plaintiff retains control over the funds in her Alliance Account. To be sure, the descriptions provide a number of provisions that provide Plaintiff control over aspects of the account, including the ability to withdraw from the account and transfer funds to another account with Defendant. Nowhere, however, do the various descriptions of the account provide any indication that Plaintiff maintained the right to control the manner in which her funds would be invested while in the Alliance Account.

Plaintiff argues that Defendant is forbidden from lending or investing Plaintiff's benefits unless it specifically describes such lending or investments to her. Under Nevada law, however, Defendant may invest Plaintiff's funds as part of its general funds. Nev. Rev. Stat. § 687B.300(1). The Alliance Account does not provide Plaintiff control of how her funds are utilized by Defendant.

Fourth, Plaintiff claims that Defendant breached its promise, under the Alliance Account, to pay a "competitive" interest rate. Plaintiff argues that Defendant's promise to pay a competitive interest rate should be construed as a promise to pay Plaintiff all of Defendant's earnings generated by reinvestment of Plaintiff's funds.

It is not reasonable to construe Defendant's promise to pay a "competitive" interest rate as a promise to entitle her to all of Defendant's proceeds.[13] Plaintiff fails to provide any basis for interpreting "competitive interest rate" in this manner. "Competitive" means "well suited for competition." RANDOM HOUSE WEBSTER'S UNABRIDGED DICTIONARY (2d ed. 2005). As such,

---

[13] The Certificate of Account Confirmation sent to Plaintiff upon the establishment of her Alliance Account establishes that the current interest rate for her account is 3.00%. (Middleton Ex. D:6.)

19

Plaintiff's claim that Defendant breached its promise to pay a competitive rate depends on comparison to other rates to which Defendant's rate would be well suited for competition.  Yet Plaintiff does not allege that the rate Defendant paid was not competitive with rates Plaintiff could have received from Defendant's competitors.

Plaintiff's reliance on <u>Rabin v. Mony Life Ins. Co.</u>, 2007 WL 737474 (S.D.N.Y. Mar. 8, 2007), further undermines her argument.  In <u>Rabin</u>, the court denied the defendant's motion to dismiss plaintiff's claim that the defendant failed to pay a competitive rate because the promotional materials promised "payment at a rate *comparable to those paid on other, higher-rate money market type investments*."  <u>Id</u>. at *3 (emphasis added).  In other words, both the contract at issue and the plaintiff's complaint contemplated a set of rates with which the defendant's rates were required to compete.[14]  Here, in contrast, Plaintiff makes no such allegation and posits no competitors with whom Defendant's rates must compete.

Plaintiff also argues that Defendant failed to adequately disclose the interest rate on Plaintiff's Alliance Account.  As counsel for Plaintiff conceded at oral argument, she received the Alliance Account Certificate, specifying an introductory 3% interest rate, within days of submitting her Claim Form.[15]

Because Plaintiff is not capable of proving any set of facts consistent with her allegations that would entitle her to relief as to her claim for breach of the Alliance Account, Defendant's

---

[14]  Summary judgment on behalf of the defendant was recently granted in this case.  <u>Rabin v. Mony Life Ins. Co.</u>, 2009 WL 4060978 (S.D.N.Y. Nov. 19, 2009).

[15]  Counsel for Plaintiff also conceded, at oral argument, that should she be unhappy with the interest rate, she could withdraw her benefits at any time by writing a check, out of the Alliance Account checkbook that arrived the same day as the Certificate, for the entirety of her benefits in the account.  (Transcript of Oral Argument at 3:17-19, 18:10-11, 18:18-25.)

Motion as to this claim is granted.  Semerenko, 223 F.3d at 173.

## IV.    Breach Of Fiduciary Duty With Respect To Alliance Account

Count IV of the Complaint alleges that Defendant breached its fiduciary duty to Plaintiff with respect to the Alliance Account.  Specifically, Plaintiff alleges that Defendant improperly delayed payment of the benefits, improperly retained and exercised control over the benefits, improperly invested the benefits, failed to disclose the manner and types of investments being made, decided unilaterally on the rate of interest to be paid, and decided unilaterally the amount of the spread (the difference between the amount it earned from Plaintiff's funds and the amount Defendant paid Plaintiff in interest).  Defendant does not owe Plaintiff a fiduciary duty.

As already discussed, Nev. Rev. Stat. § 687B.300 provides that Defendant is not required to segregate funds it is holding pursuant to a written agreement between itself and Plaintiff.  The statute itself is a sufficient ground to dismiss the claim under Nevada law.  In addition, Defendant discharged its obligations under the Policies, and any fiduciary duty that arose under the Policies, when it paid Plaintiff her death benefits by way of her Alliance Account.  (Compl. 41-43.)  "[T]he Prudential Alliance Account Settlement Option [is] a contractual obligation" – not a fiduciary obligation – "of The Prudential Insurance Company of America . . . ."  (Opp. Ex. G:1.)  Defendant's relationship to the Alliance Account is that of a financial institution.  (See, e.g., Middleton Ex. D:7 (Defendant promises to hold Plaintiff's money at interest; provide monthly statements showing Plaintiff's balance, interest earned, current interest rate, and any other account activity; the account is subject to the rules and regulations of Bank One, the servicing organization; Plaintiff can withdraw or access funds at any time by writing a check).)

A bank or financial institution does not have any fiduciary duty to a depositor.  See In re

21

Nat'l Audit Def. Network, 332 B.R. 896, 910 (Bankr. D. Nev. 2005) ("The relation between a

bank and its depositors is that of debtor and creditor."); Cascade Investments, Inc. v. Bank of

America, 2000 WL 1842945, at *3 (D. Nev. Sept. 29, 2009) ("[T]he law does not recognize a

fiduciary relationship between a lender and a borrower.").

      Nevertheless, Plaintiff argues that the Alliance Account established a fiduciary

relationship between herself and Defendant when it "unilaterally decide[d] to retain, manage and

invest benefits" belonging to her.  Plaintiff's argument is fundamentally flawed, in that

Defendant's action was not unilateral.  Rather, as discussed in reference to Plaintiff's claim for

breach of the Policies above, Plaintiff agreed that her benefits would be held by Defendant in an

Alliance Account by executing the Claim Form and leaving blank the section in which she could

designate a means other than the Alliance Account for settlement.

      Finally, Plaintiff argues that statements made by Defendant in documents describing

Plaintiff's settlement options create a fiduciary-like confidential or special relationship.

      A confidential relationship arises "where one gains the confidence of the other and

purports to act or advice with the other's interests in mind . . . it is particularly likely to exist

where there is a family relationship or one of friendship."  Perry v. Jordan, 900 P.2d 335, 338

(Nev. 1995).  A special relationship requires conditions that would cause a reasonable person to

impart special confidence, and where the trusted party should have known of that confidence.

Mackintosh v. Cal. Fed. Sav. & Loan Ass'n, 935 P.2d 1154, 1160 (Nev. 1997).  Both a

confidential relationship and a special relationship share characteristics of a fiduciary

relationship.  Clark v. Metro. Life Ins. Co., No. 08-00158, 2009 WL 536830, at *4 (D. Nev. Mar.

3, 2009).

In Clark, the district court held that "the language contained in the documents attached to [the plaintiff's] complaint is sufficient to support a claim for breach of a duty arising from a confidential or special relationship." Id. The circumstances in Clark were similar to those here. The plaintiff, a life insurance beneficiary, sued the insurer for breach of contractual obligations, breach of fiduciary duty, and unjust enrichment when the defendant retained the plaintiff's benefits in its general investment account. Id. at * 1. The court held that while Nevada law would not recognize a claim for breach of fiduciary duty against an insurer, a plaintiff might be able to state a claim based on a confidential or special relationship. Id. at *4. The court relied on statements sent by the defendant to the plaintiff that, "we are here to help you in any way we can," and, "Metropolitan Life Insurance Company is here to help you through this difficult time." Id. at *5.

Here, Plaintiff points to language in the Alliance Account documents stating that Defendant would "make[] it easy to manage your death benefit proceeds," (Opp. Ex. G), that the account would provide Plaintiff "the time needed to consider your financial options" (id.) and was a "convenient" and "easy no-cost option," (id. Ex. F), and that Defendant would provide "personal" and "financial" security. (Id., Ex. G.) In addition, Plaintiff quotes the Settlement Options brochure, which stated, "At Prudential, we realize that our responsibility doesn't end when we pay a death benefit. That is why we want to help you through this difficult time." (Id. Ex. E:1.)

Defendant's statements do not create a confidential or special relationship under Perry or Mackintosh. To the extent that Clark suggests that a confidential or special relationship should be found here, this Court disagrees with the Clark court's interpretation of Perry and

Makintosh.[16]

In <u>Perry</u>, the Nevada Supreme Court found a confidential relationship between close friends and neighbors, where the defendant was a successful, well-educated businessperson admired by the plaintiff, who possessed an eighth-grade education.  <u>Perry</u>, 900 P.2d at 336.  The defendant, after drafting a purchase agreement that the plaintiff did not read, because she relied on the defendant, sold a clothing store to the plaintiff, the sale of which gave rise to the lawsuit. <u>Id.</u> at 337.  The plaintiff stated that the defendant knew that the plaintiff did not have the experience, ability, or interest to manage the clothing store.  <u>Id.</u>  The court held that the record contained ample evidence of the existence of a confidential relationship between the parties and the breach of that relationship by the defendant.  <u>Id.</u> at 337-38.  A confidential relationship "exists where one party gains the confidence of the other and purports to act or advise with the other's interests in mind . . . it is particularly likely to exist when there is a family relationship or one of friendship."  <u>Id.</u> at 338 (citations omitted).

Here, Plaintiff and Defendant are neither family nor friends.  Defendant's offer to "help [Plaintiff] through this difficult time" does not indicate that it gained her confidence.  No confidential relationship exists, as defined by <u>Perry</u>.

In <u>Mackintosh</u>, a special relationship arose where the defendant failed to disclose the existence of material defects in a home it was selling to the plaintiffs.  <u>Mackintosh</u>, 935 P.2d at 1156.  The defendant was not only selling the home, but was also acting as the lender for the plaintiff's purchase of the home.  <u>Id.</u>  In order to complete the purchase, the defendant had

---

[16]  Because this is an issue of state law, the Nevada Supreme Court's opinions in <u>Perry</u> and <u>Mackintosh</u> are binding, and <u>Clark</u> is merely advisory.

required the plaintiffs to obtain financing for the home purchase through the defendant.  Id. at 1160.  The plaintiffs testified that because of that insistence, they believed that the defendant would not lend the money if the property contained material defects.  Id.  In fact, the defendant knew that the basement of the house had a serious flooding problem  Id.

Here, Defendant did not hide knowledge of anything like the material defects at issue in Mackintosh.  Rather, it presented information and disclosures regarding the Alliance Account and only placed Plaintiff's benefits in an Alliance Account after she completed the Claim Form allowing them to do so.[17]  Plaintiff analogizes Defendant's failure to disclose that it would place Plaintiff's funds in its general investment account to the Mackintosh defendant's failure to disclose the serious flooding problem.  Plaintiff's comparison is inapt.

For these reasons, this Court finds that Plaintiff is not capable of proving any set of facts consistent with her allegations that will entitle her to relief on this claim.  Semerenko, 223 F.3d at 173.  Defendant's Motion is granted with respect to the Plaintiff's claim for breach of fiduciary duty.

**V.     Unjust Enrichment**

Plaintiff's fourth cause of action is for unjust enrichment.  Plaintiff claims that Defendant obtained a financial benefit by its retention and reinvestment of the life insurance benefits due Plaintiff, and that the interest rate Defendant pays to Plaintiff is less than that financial benefit.

---

[17]  Plaintiff's argument that a confidential or special relationship existed would have been considerably strengthened had it arisen from her interaction with an agent of Defendant with whom Plaintiff had a longstanding relationship.  In that scenario, it is possible that the agent would have garnered the trust and respect of Plaintiff and her family to the extent that a confidential relationship, under Perry, or a special relationship, under Mackintosh, had been formed.

This claim fails to state a claim on which relief may be granted.

"An action based on a theory of unjust enrichment is not available when there is an express, written contract, because no agreement can be implied where there is an express agreement." Leasepartners Corp. v. Robert L. Brooks Trust, 942 P.2d 192, 187 (Nev. 1997); see also Briggs v. Luisi, 2006 WL 1476929, at * 4 (N.J. Super. Ct. App. Div. May 22, 2006) (unjust enrichment is a quasi-contract theory; where there is an actual contract, "there is no basis for imposing relief under a theory of quasi-contract").

The Complaint acknowledges the existence of an express, written contract for the Policies and the Alliance Account.  (Compl. ¶¶ 28-33, 35.)  Both parties have provided this Court with extensive evidence as to the existence of express, written contracts for the Policies and the Alliance Account.  (See Compl. Ex. 1 (copy of Alliance Account contract); Middleton Exs. 1-4 (copies of the 1956 Policy, the 1972 Policy, the 1983 Policy, and the Alliance Account contracts, respectively); Opp. Exs. B-D, F (same).)

Because there is no question that express, written contracts govern the claims at issue, Plaintiff is not capable of proving any set of facts consistent with her allegations that will entitle her to relief.  Semerenko, 223 F.3d at 173.  Defendant's Motion is granted as to Plaintiff's claim for unjust enrichment.

26

**CONCLUSION**

For the reasons given above, Defendant's Motion to Dismiss The Complaint (Docket No.

14) is granted, without prejudice.


 S/Joseph A. Greenaway, Jr.             
JOSEPH A. GREENAWAY, JR., U.S.D.J.


December 29, 2009